# Third District Court of Appeal
## State of Florida

Opinion filed August 18, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-2427
Lower Tribunal No. 19-21027
_____

**Birol Ozyesilpinar,**
Appellant,

vs.

**Hassan Jalali,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Christine Bandin, Judge.

Bartlett Legal, PLLC, and Philip Bartlett, for appellant.

BickmanLaw, PLLC, and Joshua Bickman, for appellee.

Before LINDSEY, MILLER, and LOBREE, JJ.

LINDSEY, J.

Appellant Birol Ozyesilpinar appeals from a Final Judgment of Injunction for Protection against Stalking Violence entered in favor of Appellee Hassan Jalali. Because the record is insufficient to establish a minimum of two incidents of stalking, we reverse the permanent injunction.

## I.    BACKGROUND

Ozyesilpinar is the owner of a condominium unit in the Ocean Five Condominiums. Jalali is the president of the condominium association. In June 2019, the association filed an action against Ozyesilpinar seeking, *inter alia*, to enjoin her from engaging in short-term rentals of her unit.[1] According to Jalali, this caused Ozyesilpinar to retaliate, giving rise to Jalali's underlying Petition for Injunction for Protection Against Stalking.

In support of his Petition, Jalali listed six incidents comprised of emails, phone calls, and personal contact—mostly with third parties—that he alleged amounted to stalking, cyberstalking, and harassment.[2] These

---

[1] Prior to the June 2019 action, a dispute between Ozyesilpinar and a prospective short-term rental tenant from England went viral. The prospective tenant sued Ozyesilpinar in November 2019, alleging racist and discriminatory conduct. This action remains pending. Although Jalali attempts to inject the unsavory allegations of this incident into this case, Ozyesilpinar's behavior towards the prospective tenant has nothing to do with whether the statutory elements of stalking are satisfied as to Jalali.

[2] Specifically, Jalali alleged the below listed instances of stalking, cyberstalking, and harassment, though there was less than complete

2

testimony during the evidentiary hearing as to these allegations; some were not mentioned at all.

- "First, on or about August 11th, 2019, [Ozyesilpinar] emailed three (3) of [Jalali's] business associates, writing [Jalali] had been 'arrested for gold smuggling.'"

- "Also on August 11th, 2019, [Ozyesilpinar] telephoned two (2) of [Jalali's] employees and left voicemails telling the employees [Jalali] had been 'arrested and jailed for gold smuggling' and how this is 'great news' and how [Jalali] should bring 'souvenirs' and wondering 'how did he eat while he was in Jail.'"

- "On or about August 12th, 2019 [Ozyesilpinar] approached two (2) business contacts of [Jalali] to tell them [Jalali] had been arrested and jailed for smuggling gold and funding terrorist organizations."

- "On or about August 12th, 2019, [Ozyesilpinar] emailed ten (10) of [Jalali's] business associates again [that Jalali] was a gold smuggler and insinuating [Jalali] has been the victim of prison rape in Colombia."

- "On or about August 16th, 2019 [Ozyesilpinar] emailed seven (7) City of Miami Beach officials and employees again alleging [Jalali] was under investigation by the FBI for money laundering, gold smuggling and funding terrorists and that certain employees of the City of Miami Beach were part of [Jalali's] criminal enterprise."

- "On or about September 10th, 2019 [Ozyesilpinar] contacted three (3) of [Jalali's] business associates telling the business associates [Jalali] 'served prison time but did not bring us a souvenir' and

3

communications were largely related to allegations of Jalali being involved in gold smuggling in Colombia.

In September 2019, the lower court granted Jalali a temporary injunction. In November 2019, the court conducted a final hearing to determine whether to issue a permanent injunction. At the injunction hearing, the court heard testimony regarding the following incidents:[3]

- An employee of a gelato shop inside Ocean Five testified that Ozyesilpinar unexpectedly approached her one day and told her Jalali had been arrested for gold smuggling and to "take a look online. It is all over the internet."

- Jalali testified that Ozyesilpinar sent him and several others an email on August 12, 2019, referencing Jalali's alleged gold smuggling in Colombia and the short-term rental dispute between Ozyesilpinar and a prospective tenant from England. Jalali also testified about two incidents not alleged in his petition, a Tripadvisor review[4] of Ocean Five allegedly written by Ozyesilpinar and a Facebook post, both of which state that Jalali had been arrested in Colombia for gold smuggling.

---

threatening the business associates with the gold smuggling 'profits being transferred to Libya to terrorist organizations' …. and that the contacted business associates 'knew about this and are bad actors as well.'"

[3] Jalali called several witnesses, each of whom was asked if they feared Ozyesilpinar. The trial court correctly disregarded this evidence: "I am not considering who else was in fear of her because that is not something that I can consider."

[4] Ozyesilpinar denied writing the Tripadvisor review.

- The office manager of Ocean Five testified about an August 11, 2019 voicemail from Ozyesilpinar asking him why he never told her that Jalali was arrested in Colombia for smuggling gold.

- The front desk clerk at Ocean Five testified that he received a phone call from Ozyesilpinar on August 11, 2019, informing him that Jalali had been arrested for smuggling gold in Colombia and asking if Jalali had sent him any gold as a souvenir.

- The secretary of the Ocean Five Condominium Association testified that he receives a lot of emails from Ozyesilpinar, including emails that Jalali should not serve on the board.

Ozyesilpinar's position was that she had a legitimate concern that the president of her condominium association was engaged in illegal activities. On cross-examination, Jalali testified that although he was not arrested in Colombia, he was under investigation by the Colombian government for investments he made in a company that had licenses to mine gold. Other witnesses, such as the office manager and the secretary, agreed on cross-examination that Ozyesilpinar could have legitimate reasons for asking whether Jalali was under criminal investigation.

The court found that Jalali and Ozyesilpinar "had a very tumultuous relationship" from day one and that there were no innocent parties. The court also partially agreed with Ozyesilpinar, finding that "in the very beginning there [were] a lot of legitimate reasons why you were sending e-mails about the building and about the safety of the building and everything else[.]"

5

However, the court also found that despite Ozyesilpinar's legitimate concerns, "it took a turn at some point."

The court ultimately entered a permanent injunction based on two incidents. The first was the August 12, 2019 email to Jalali (and others) that referenced Jalali's alleged gold smuggling in Colombia and the short-term rental dispute between Ozyesilpinar and a prospective tenant from England. The court found that this email was "inflammatory" and not sent for a legitimate purpose. Ozyesilpinar agreed.

The trial judge also mentioned Ozyesilpinar's conversation with the gelato shop employee. But when Ozyesilpinar insisted the conversation never took place, the court turned to what it considered to be the only remaining incident: "So I am left with the Facebook post." The post reads in its entirety as follows: "OWNER OCEAN FIVE HOTEL LLC ARRESTED IN COLOMBIA IRANIAN GOLD SMUGGLER HASSAN BIDGOLI JALALI[.]" The post also included a link to an article, presumably about gold smuggling, from insightcrime.org.[5] The court concluded that the post "[i]s not a legitimate purpose. That is a problem."

Based on the August 12, 2019 email and the Facebook post, the trial court issued a permanent injunction against Ozyesilpinar and ordered her to

---

[5] The contents of this article are not part of the record.

have "no contact" with Jalali either directly or indirectly. And given that both parties owned units in the same building, the trial court attempted to draft an order that did not "deprive [Ozyesilpinar] from her due process rights to be in the condominium and use of the common areas." The written order does not specify the two incidents that support the injunction, nor does it make any findings with respect to the statutory elements for stalking. Ozyesilpinar timely appealed.

## II.    ANALYSIS

We review the trial court's factual findings for competent substantial evidence. See Stone v. McMillian, 270 So. 3d 510, 512 (Fla. 1st DCA 2019) ("A trial court's imposition of [an injunction for protection against stalking] is reviewed for abuse of discretion and must be supported by competent, substantial evidence." (citing Pickett v. Copeland, 236 So. 3d 1142, 1143–44 (Fla. 1st DCA 2018))); see also Philip J. Padovano, 2 Fla. Prac., Appellate Practice § 19:5 (2021 ed.) ("If an injunction rests on a finding of fact it will be reviewed by the competent substantial evidence test."). Legal sufficiency of the evidence to justify an injunction is reviewed de novo. Picket, 236 So. 3d at 1144 (citing Wills v. Jones, 213 So. 3d 982, 984 (Fla. 1st DCA 2016)).

Section 784.0485(1), Florida Statutes (2020), creates "a cause of action for an injunction for protection against stalking." As defined by section

7

784.048(2), "[a] person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking . . . ." See Washington v. Brown, 300 So. 3d 338, 340 (Fla. 2d DCA 2020) ("We interpret section 784.0485 with reference to the definitions found in section 784.048, which makes stalking under certain conditions a criminal offense, and refer to section 784.046 (providing for protective injunctions for victims of repeat violence) and the cases interpreting that statute for guidance.").

"Hence, to warrant issuance of a stalking injunction, the record must establish that the respondent either 'followed,' 'harassed,' or 'cyberstalked' another." Santiago v. Leon, 299 So. 3d 1114, 1117 (Fla. 3d DCA 2020). There are no allegations of following in this case, so we focus on the statutory requirements for harassment and cyberstalking. Both harassment and cyberstalking require a "course of conduct" that is "directed at a specific person"[6] causing "substantial emotional distress to that person" that "serves no legitimate purpose." See § 784.048(1)(a) and (d), Fla. Stat. (2020).

---

[6] In Santiago, this Court held that "Florida case law has mandated that threats via social media be directed to the individual – not by content, but *by delivery* . . . ." 299 So. 3d at 1119. Santiago relied on Logue v. Book, a Fourth District panel decision. The Fourth District subsequently granted rehearing en banc in Logue and vacated the panel decision, holding that "a course of conduct 'directed at' a victim can include communications with third parties." Logue v. Book, 297 So. 3d 605, 612 (Fla. 4th DCA 2020), review denied, SC20-1063, 2021 WL 276145 (Fla. Jan. 27, 2021). The Florida Legislature recently amended the definition of "Cyberstalk" in section

"[B]y its statutory definition, stalking requires proof of repeated acts." Pickett, 236 So. 3d at 1144 (quoting Lukacs v. Luton, 982 So. 2d 1217, 1219 (Fla. 1st DCA 2008)); see also Carter v. Malken, 207 So. 3d 891, 894 (Fla. 4th DCA 2017) ("A minimum of two incidents of harassment are required to establish stalking." (citing Wyandt v. Voccio, 148 So. 3d 543, 544 (Fla. 2d DCA 2014))). Further, each incident must be supported by competent substantial evidence. See David v. Schack, 192 So. 3d 625, 628 (Fla. 4th DCA 2016) (quoting Touhey v. Seda, 133 So. 3d 1203, 1204 (Fla. 2d DCA 2014)).

On appeal, Ozyesilpinar argues that the evidence presented below was insufficient to satisfy the legal definition of stalking in section 784.048. We agree.

As an initial matter, the trial court's finding that some of the alleged incidents were for a legitimate purpose is supported by competent substantial evidence. See Logue v. Book, 297 So. 3d 605, 614 (Fla. 4th DCA 2020), review denied, SC20-1063, 2021 WL 276145 (Fla. Jan. 27, 2021) ("A

---

784.048 as follows: "To engage in a course of conduct to communicate, or to cause to be communicated, **directly or indirectly**, words, images, or language by or through the use of electronic mail or electronic communication, directed at **or pertaining to** a specific person . . . ." Ch. 2021-220, Laws of Fla. (additions in bold) (effective October 1, 2021). Our analysis does not rely on the "directed at" statutory requirement.

finding of 'no legitimate purpose' to a given action must not only comport with common sense, it must also be evidenced by a complete lack of usefulness or utility." (citing David v. Textor, 189 So. 3d 871, 875 (Fla. 4th DCA 2016) ("[W]hether a communication serves a legitimate purpose is broadly construed and will cover a wide variety of conduct."))). It is undisputed that Jalali was under investigation by authorities in Colombia for matters related to investments he made in a gold mining company. As Jalali himself admitted on cross-examination, it is understandable that residents would be concerned that the president of the condominium association was under investigation.

The trial court relied on two incidents in support of the permanent injunction: (1) the August 12, 2019 email and (2) a Facebook post. Based on the record before us, we conclude that the Facebook post was legally insufficient to support an incident of stalking. It contains the same allegations of gold smuggling found in the various emails that the trial court correctly determined were for a legitimate purpose. See O'Neill v. Goodwin, 195 So. 3d 411, 413 (Fla. 4th DCA 2016) ("[C]ourts have generally held that contact is legitimate when there is a reason for the contact other than to harass the victim.").

Moreover, the trial court made no express findings that the Facebook post satisfied the other statutory elements. See Santiago, 299 So. 3d at 1117 (Fla. 3d DCA 2020) (reversing a stalking injunction where "the transcripts for the two evidentiary hearings reflect that, aside from determining that Santiago had engaged in 'stalking-like' and 'creepy' behavior, the lower court neither referred to section 784.048, nor made any express findings with respect to any of the statutory elements for stalking set forth therein"); Hutsell v. Hutsell, 263 So. 3d 266, 268 (Fla. 1st DCA 2019) (reversing a domestic violence injunction based on stalking where the trial court did not make specific findings, and the evidence presented was legally insufficient to support the injunction); see also Jones v. Jackson, 67 So. 3d 1203, 1205 (Fla. 2d DCA 2011) (Altenbernd, J., concurring) ("[T]his case is an example of an injunction that would have been easier for the appellate court to review if there had been findings of fact.").

Because the Facebook post is legally insufficient and it was the only other incident apart from the August 12 email that the trial court considered sufficient, the record does not support the permanent stalking injunction, which requires a minimum of two incidents. This is not to say we approve of Ozyesilpinar's conduct, which even she conceded was, at times, inappropriate. "But, for us to affirm the challenged injunction order, the

11

complained-of conduct must meet the express statutory elements." Santiago, 299 So. 3d at 1120.  Here, it does not.  "As tempting as it might be to force some civility into the matter by stanching Respondent's speech against Petitioner with a court order, to do so would ignore the protections of the First Amendment and the wording of the stalking statute."  Logue, 297 So. 3d at 618.

Reversed and remanded.